

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-06-455-CR

DONALD JOSEPH BANKS, SR.          APPELLANT

V.

THE STATE OF TEXAS          STATE

------------

FROM THE 78TH DISTRICT COURT OF WICHITA COUNTY

------------

### MEMORANDUM OPINION[1]

------------

Because we made a minor modification to our original opinion, in the addition of a footnote to page 4, we withdraw our prior opinion of May 22, 2008, and substitute the following memorandum opinion in its place.

---

[1] *See* TEX. R. APP. P. 47.4.

## I.  Introduction

In two issues, appellant Donald Joseph Banks, Sr. appeals his convictions for one count of injury to a child and one count of aggravated sexual assault. He asserts that the trial court erred by allowing a child, "Jane Doe," to testify by videotaped closed-circuit television because the State failed to prove the necessity of such procedure and because the statute authorizing the procedure was unconstitutional as applied to him.  We affirm.

## II.  Factual and Procedural History

The State alleged that, on June 5, 2005, Banks anally penetrated his eight-year-old granddaughter, "Jane Doe," when she spent the night at his residence.  Doe told her mother the next day about what had happened, and Banks was arrested.

On August 7, 2006, a pretrial hearing was held on a motion to quash the State's subpoena of Doe, to determine whether to allow Doe's recorded testimony.  Carissa Matlock, Doe's guardian ad litem, testified that, based on her relationship with Doe and her review of the records provided by Doe's counselor, Arthur Madden, she did not feel that it would be in Doe's best interest to testify in this case, either live or by closed circuit television.  Matlock added that she would do whatever possible to stop Doe from having to testify because Doe was starting to make progress.  However, Matlock did state that

2

it would be better for Doe to testify now than to wait until some point in the future to bring the case.

A statement from Madden was also considered at this hearing. It read in part:

> 4. In order to effectively process past abuse, the patient must build a meaningful relationship with me and feel comfortable discussing the events and associated trauma.
>
> 5. Only within the last month has [Doe] been able to form such a relationship with me and been willing to approach the subject of the abuse at the hands of her grandfather.
>
> 6. On June 26, 2006, during our session, for the first time, she gave me her full recollection of the events surrounding her grandfather's abuse, but made clear to me that she would tell the story only one time and did not want to talk about it again.
>
> 7. I do not believe that [Doe] will re-tell the events, especially in a strange environment and to strangers. I predict that she will likely refuse to speak about the assault.
>
> 8. I believe that to repeat her recollection or to face questions about the assault will be harmful to [Doe]. [Doe] has already been struggling in a therapeutic environment and she should not be forced to repeat her recollections.
>
> 9. I believe that to testify or respond to questions about the abuse will result in more trauma to [Doe].
>
> 10. I have no reason to believe that [Doe]'s version of the events surrounding her grandfather's assault is not true.
>
> 11. In conclusion, from a clinical standpoint, I do not believe that it is in [Doe]'s best interest to be questioned or be forced to testify about the assault at this time.

3

The trial court ruled,

> So I'm going to go back and basically make the finding based on everything that I've been provided that the child is younger than 13 years of age, is unavailable to testify in the presence of the Defendant as outlined in the requirements and the conditions for making such a finding. I'm going to basically say that the testimony is going to be done by closed circuit television[.]

The trial court's subsequent Order read in part,

> The child, [Doe], is under thirteen (13) years of age.
>
> The child, [Doe], is unavailable to testify in the presence of the Defendant, [Banks], within the meaning of article 38.071 of the Texas Code of Criminal Procedure. . . . [T]he child's trial testimony shall be taken via closed-circuit television on that date. Counsel for the State and Counsel for the Defendant shall be permitted to question the child fully at this time . . . . [T]he Defendant shall be permitted to view and hear the testimony of the child as it progresses, via one-way monitor. Defendant's counsel shall be permitted to take breaks and consult with the Defendant as necessary.

On August 23, 2006, the trial court conducted a hearing in which Doe's videotaped testimony was taken.[2] At the conclusion of testimony in the hearing, the Court clarified that Banks had the opportunity to converse with counsel during the hearing, and that the conversations took place whenever they were requested.

---

[2] "Jane Doe" was cross-examined extensively by defense counsel, consisting of some thirty-nine pages from the court reporter's record.

4

On October 2, 2006, Banks pled not guilty to both counts. Banks objected to the showing of Doe's videotape, and the trial court overruled his objection. Doe's previously recorded testimony was shown to the jury, and numerous other witnesses testified. The jury found Banks guilty of injury to a child and aggravated sexual assault, assessing punishment at ten years' confinement on the injury to a child count and ninety-nine years' confinement on the count of aggravated sexual assault. This appeal followed.

### III. Face-to-Face Confrontation

In his first issue, Banks complains that he was denied his right to confront Doe in person because the State failed to prove the necessity of allowing her testimony to be presented by videotape. Specifically, Banks argues that there was insufficient proof presented to the trial court that his presence would cause trauma to Doe and that the trial court should have reassessed the "unavailability" of Doe at the time of trial.

#### A. Standard of Review

When determining whether the trial court correctly determined that Doe would not be required to confront Banks face to face, we review the court's ruling for an abuse of discretion. *Rangel v. State*, 199 S.W.3d 523, 531 (Tex. App.—Fort Worth 2006, pet. dism'd); *Barnes v. State*, 165 S.W.3d 75, 84 (Tex. App.—Austin 2005, no pet.). We will not reverse a trial court's ruling

5

that is within the zone of reasonable disagreement. *See Green v. State*, 934

S.W.2d 92, 102 (Tex. Crim. App. 1996), *cert. denied*, 520 U.S. 1200 (1997);

*Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1991) (op. on

reh'g).

**B. The Statutory Requirements for Videotaped Testimony of a Child**

Article 38.071 of the Texas Code of Criminal Procedure, entitled

"Testimony of child who is victim of offense," sets forth, *inter alia*, the

parameters for videotaping a child's testimony and the requirements for the trial

court to determine when a child is "unavailable" to testify in the presence of the

defendant about a sexual offense. TEX. CODE CRIM. PROC. ANN. art. 38.071

(Vernon Supp. 2007). Specifically, sections 4 and 8 of the article read in part

as follows:

> Sec. 4. (a) After an indictment has been returned . . . the court
> may order that the testimony of the child be taken outside the
> courtroom and be recorded for showing in the courtroom before the
> court and the finder of fact. . . . The court shall permit the
> defendant to observe and hear the testimony of the child and to
> communicate contemporaneously with his attorney during periods
> of recess or by audio contact but shall attempt to ensure that the
> child cannot hear or see the defendant.
>
> (b) The court may set any other conditions and limitations on the
> taking of the testimony that it finds just and appropriate, taking
> into consideration the interests of the child, the rights of the
> defendant, and any other relevant factors. The court shall also
> ensure that:

6

> (1) the recording is both visual and aural and is recorded on film or videotape or by other electronic means[.]
>
> . . . .
>
> Sec. 8. (a) In making a determination of unavailability under this article, the court shall consider relevant factors including the relationship of the defendant to the child, the character and duration of the alleged offense, the age, maturity, and emotional stability of the child, and the time elapsed since the alleged offense, and whether the child is more likely than not to be unavailable to testify because:
>
>> (1) of emotional or physical causes, including the confrontation with the defendant; or
>>
>> (2) the child would suffer undue psychological or physical harm through his involvement at the hearing or proceeding.
>
> (b) A determination of unavailability under this article can be made after an earlier determination of availability. A determination of availability under this article can be made after an earlier determination of unavailability.

*Id*. art. 38.071, §§ 4, 8. Such statutory schemes have been generally approved by the United States Supreme Court. *See Maryland v. Craig*, 497 U.S. 836, 857, 110 S. Ct. 3157, 3169 (1990) (concluding that a statutory procedure utilizing closed-circuit television for receipt of testimony did not violate a defendant's rights under the Confrontation Clause articulated in the Sixth Amendment in the United States Constitution).

In *Craig*, the Court said,

7

if the State makes an adequate showing of *necessity*, the state interest in protecting child witnesses from the trauma of testifying in a child abuse case is sufficiently important to justify the use of a special procedure that permits a child witness in such cases to testify at trial against a defendant in the absence of face-to-face confrontation with the defendant.

*Id*. at 855, 110 S. Ct. at 3169 (emphasis supplied). In making this "necessity" finding, our court of criminal appeals has held that it

must be on a case by case basis. "[T]he trial court must hear evidence and determine": *First*, "whether use of the one-way closed-circuit procedure is necessary to protect the welfare of the particular child witness who seeks to testify." *Second*, the trial court must also find "that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Third* and finally, the trial court must determine that the emotional distress suffered by the child witness in the presence of the defendant is "more than de minimis, i.e., more than mere nervousness or excitement or some reluctance to testify." If the trial court makes these three findings, then "the Confrontation Clause does not prohibit the use of a procedure that, despite the absence of face-to-face confrontation, ensures the reliability of the evidence by subjecting it to rigorous adversarial testing and thereby preserves the essence of effective confrontation."

*Gonzales v. State*, 818 S.W.2d 756, 762 (Tex. Crim. App. 1991) (citations omitted), *cert. denied*, 507 U.S. 939 (1993).

**C. Application**

In reviewing article 38.071, we first note that Doe was only nine years old at the time of trial, thus meeting the statute's "under age thirteen requirement." TEX. CODE CRIM. PROC. ANN. art. 38.071, § 1. Like in *Barnes*, the

trial court conducted a hearing on the necessity for using closed-circuit television but did not make express findings of fact and conclusions of law. *See* 165 S.W.3d at 84. By permitting the use of the closed-circuit television system, however, the court implicitly made the constitutionally required findings. *See id.* Banks urges that the evidence adduced at the hearing is not sufficient to support these findings.

An initial review of section 8(a) of article 38.071 reveals that there are two circumstances under which it may be determined that a child is "unavailable" to testify, due to (a) emotional or physical causes, which include confrontation of the accused, or (b) the suffering of undue psychological or physical harm through the involvement of the accused in the hearing. TEX. CODE CRIM. PROC. ANN. art. 38.071, § 8(a). Matlock's testimony, as guardian ad litem, and Madden's letter appear to satisfy the first circumstance. However, it is unclear whether this circumstance satisfies the requirement, imposed by our court of criminal appeals in *Gonzales*, "that the child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant." *Gonzales*, 818 S.W.2d at 762.

Here, we seem to have a middle ground, wherein the concern expressed by Matlock and Madden is for the child having to recount the occurrence itself and the questioning of the surrounding events concurrent therewith. Naturally,

9

this would occur in a trial setting with the defendant present. However, at no point did either Madden or Matlock directly mention that the defendant's presence was the source of the trauma. Rather, it was the questioning and the recounting of the occurrence that they described as the source of the trauma. Hence, we cannot say that article 38.071, section 8(a)(1) was satisfied, or that section 8(a)(2) would have been. Therefore, there was insufficient evidence to support the trial court's order, constituting an abuse of the trial court's discretion.

### D. Harm Analysis

Having found error, we must conduct a harm analysis to determine whether the error calls for reversal of the judgment. TEX. R. APP. P. 44.2. For a constitutional error, we apply rule 44.2(a) and reverse unless we determine beyond a reasonable doubt that the error did not contribute to the appellant's conviction or punishment. TEX. R. APP. P. 44.2(a).

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications,

10

the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution." *Id.* at 586.

Doe's general videotaped testimony from the closed circuit hearing was that, when she was eight years-old, she and her brothers stayed over at Banks's house after her mother dropped them off at a park and left them with Banks.[3] While she was in bed asleep, Banks pulled down her shorts and panties and stuck his "body part" in her "bum-bum," which woke her.[4] After she woke up, she went into the bathroom, and after she wiped, she saw blood; she had not been bleeding before she went to sleep. After she left the bathroom, she went into the living room to sleep. Later, when she woke up, Banks took her back to her house, where she told her mother what had occurred. Doe also stated that she told Banks that she was going to tell her mother what he had

---

[3] Doe testified both that this was the first time she had stayed at Banks's house and that she had slept there on prior occasions.

[4] After being shown diagrams of a male and female body, Doe stated that she called her rear end both her bum-bum and her butt, that she had referred to Banks's penis as his body part, and that his penis was what he had put in her bum-bum.

11

done and after she told her mother, the police came, and she was taken to a hospital where a nurse examined her and took the clothing that she had been wearing at the time of the alleged sexual assault.

The question here is whether the trial court's order allowing Doe to give this testimony via closed-circuit television was harmless beyond a reasonable doubt. *See Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State,* 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

### 1. *State's Witnesses*

Callie Siegler, the Sexual Assault Nurse Examiner ("SANE") coordinator at United Regional Hospital, testified that she had participated in Doe's examination on June 5, 2005, and described the history she took from Doe. She recorded on her medical chart, word for word, that Doe told her that Banks had humped her, that he ceased when she woke up, and that it hurt. Siegler stated that, as they were about to begin the physical exam, Doe told her that Banks had "put it inside me" and she pointed between her legs.

Siegler then testified that the physical examination revealed a fresh tear posterior to the anus containing frank blood that was an inch and a half in

12

length.[5] She observed Doe's injured area with both a colposcope and with the naked eye. Siegler testified that State's Exhibit 11 was a photograph of the genital area of Doe, and that it showed a tear that was very close to the entrance of the anus. Siegler testified that it was significant that there was a tear in that area, as positive findings are found in less than 10% of examinations. Siegler testified that the tear was consistent with Doe's history of sexual assault, although that type of injury was consistent with blunt force trauma, which could be caused by things other than a male penis.

Estes testified that there was no trauma to Doe's vaginal area, but that there was an abrasion on the rectum that contained frank blood, and opined that based on her experience and training, the tear of Doe's rectum was a fresh tear. Estes testified that State's Exhibit 6 was a photograph taken with a colposcope of Doe that shows the tear posterior to Doe's anus.[6] Estes testified

---

[5] Jamie Estes, another SANE, who performed Doe's examination with Siegler, defined frank blood as fresh, red blood from an actively bleeding abrasion.

[6] Estes also testified that Dr. Jayme Coffman, from Cook Children's Hospital in Fort Worth, was emailed a copy of the photos. Dr. Coffman, a pediatrician and healthcare provider to child victims of sexual abuse, also testified at trial, during Banks's case in chief. Estes testified that Dr. Coffman had noted that the tear was in the perineum, but explained that the emailed photos had not included the rectum; thus, there was no frame of reference for Dr. Coffman to determine what area of Doe's body she was looking at.

that the tear was consistent with anal penetration by the male sexual organ, but agreed that there were causes other than anal penetration for that type of injury. She testified that, to her knowledge, there was no trauma to the anus and that there was no evidence of any type of lubrication.

Deanna Tofte, a Wichita Falls police officer, testified that she had been the lead investigator in the Banks case. She testified that she had been dispatched on June 5 in the evening on a report of possible sexual assault that had occurred on June 4, and that the alleged victim was Doe. Officer Tofte testified that she took Doe to the hospital, waited while the exam was performed, and then took Doe to the child advocacy center, where Tracy Anderson of CPS interviewed Doe. Officer Tofte stated that Doe's interview was recorded and that she watched the interview through a two-way mirror. Based on Doe's statement and the medical exam results, she obtained a search warrant, served the warrant at Banks's residence, and arrested him.[7]

Officer Tofte testified that after she arrested Banks, she Mirandized[8] him and then obtained a videotaped statement. Tofte further testified that she did

---

[7] Officer Tofte admitted that, in the search warrant, she made a mistake in her "articulation of the actual injury and how it occurred."

[8] *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602 (1966).

14

not threaten, coerce, or abuse Banks, nor promise him anything or deny him water or access to the restroom. Tofte testified that State's Exhibit 4 was an original recording of Banks's statement. State's Exhibit 4 was published to the jury.

Tammy Byers, a lab analyst with the Department of Public Safety ("DPS"), testified that when she received State's Exhibit 7, a box containing vaginal and anal swabs and Doe's clothing, she unsealed the box and tested its contents. She testified that she did not detect any semen or spermatozoa on the vaginal or anal swabs or on any of the clothing. Byers further stated that there was a presumptive test for the presence of blood done on a stain in the crotch area of the panties, and that it was positive, but that, without DNA, she could not specifically state that it was human blood, and that she had no way to tell how long the blood had been there.

Madden, Doe's counselor, testified that on June 26, 2006, Doe told him about the alleged assault. He read verbatim the following from his report:

> It says, [Doe] states that at her grandfather's . . . house in the middle of the night, he woke her up. She states he was lying behind her, and said that they were both on their sides. She states he pulled down her shorts and was humping her. She states it hurt, and she said, I'm going to tell Momma. He said, I didn't do it, and if I did, I'm sorry.
>
> She states that she went to the bathroom and discovered she was bleeding from the rectum. She states she then went to the

15

living room, where her grandfather's girlfriend was sleeping on the couch. She states Margie . . . woke up and gave her a sheet, and [Doe] slept on the couch.

[Doe] said her grandfather . . . took them home the next morning, and she told her mother as soon as she got home. Her mother reportedly phoned the police.

Madden further testified that, in his experience, children typically prefer not to disclose abuse, that it was unusual for the alleged victim to confront the alleged abuser, and that it did not appear Doe was being used by anyone. Although Madden also testified that part of the reason Doe had been brought to counseling was physical abuse and neglect perpetrated by her mother, he restated that, in his experience and training, eight-year-old females do not typically dream about being sexually assaulted and that Doe exhibited signs and symptoms consistent with sexual assault.

### 2. *Defense Witnesses*

Dr. David Sabine, a clinical psychologist, testified that he had been asked to perform a psychological evaluation of Doe and that he had performed an assessment of her intellectual, academic, and emotional functioning. Dr. Sabine testified that there was no evidence in the tests that he conducted to support the idea of sexual abuse. However, he also stated that he was not testifying that sexual abuse had not occurred, and that a child with Oppositional Defiant

16

Disorder,[9] which Doe has, could be sexually abused. He added that Doe's low-average range intellectual ability made it less likely that she would fantasize about sexual abuse. Dr. Sabine also testified that while it is common for Oppositional Defiant children to lie about things, it is uncommon for them to lie about sexual abuse.

Dr. Marvin Leon Morris, a forensic psychologist, testified that although he had not examined Doe, he had reviewed records, reports, transcripts, and videotapes related to her. He further testified that he felt that the CPS interviewer did not ask the questions in a neutral way and might have biased Doe.[10] Dr. Morris testified that he was not asked to tell the jury whether Doe was abused, but rather, to tell the jury about what he felt to be a faulty interview technique utilized by CPS. However, he also testified that he had never performed the type of interview that CPS had performed and that he was

---

[9] Dr. Sabine testified that Oppositional Defiant Disorder

is a disorder of childhood that's characterized by children who are often oppositional, meaning that they resist authority and they're defiant. They often will say no when asked to do things. It also involves sometimes lying and stealing and acting out in terms of behavioral dyscontrol, being unable to manage their behavior well.

[10] Morris also stated that he had a problem with the videotaping done by the trial court, as he felt leading questions were asked by both the State and Banks's counsel.

only there to testify about the proper procedure for concluding an interview. He did not have an opinion whether the CPS interviewer, the SANE nurses, Madden, or anyone else was not neutral prior to interviewing Doe.

Dr. Coffman testified that she had reviewed reports and photographs in this case and found that, while there did not appear to be injury to Doe's anus, there was an acute tear near Doe's anus, the location of which was unusual in victims of sexual abuse. However, although she testified that anything that might stretch the area of the anus could have caused the tear and bleeding that occurred, she also testified that her findings were in agreement with Siegler and Estes's findings. She added that fewer than 5% of cases involving anal penetration have positive findings in a medical exam of anal penetration. She testified that the history given by Doe was consistent with the medical findings of Siegler and Estes's examination.

Banks testified that the allegations against him were false. He testified that Doe's mother would regularly drop Doe and her siblings off with him and that the children, including Doe, had lived with him for a few months of the prior year. He testified that on June 4, 2005, he had been drinking beer and vodka in the park with some friends and that he was taking some medications at the time. While he was at the park, Doe's mother dropped Doe and her siblings off at the park with him, where they remained for a couple of hours.

18

After picking up his girlfriend, Banks and the children went to his house. He testified that he, Eddie, and Travon—Doe's brothers—watched TV in the bedroom, while Doe and her sister and his girlfriend watched TV in the living room. Doe joined Banks and her brothers when it started storming outside, because she was scared of thunderstorms.

Banks testified that, after a while, the children fell asleep and he lay down in the bed with Doe's back to him. Banks then testified that he fell asleep, and the next thing he remembered was Doe telling him that she was hurting down there.[11] Banks testified that Doe claimed that he had poked her "down there," and that he told her that, if she hurt down there, to make sure she told her mother. He testified that he did not try to have anal sex with Doe that evening and that he kept the children until around 3:00 p.m. the next day, when he took them to their mother's house.

Banks stated that he had not done anything to Doe, and that he did not know who did. Banks further testified that he did not know if eleven-year-old Travon had done it, and that he did not think that five-year-old Eddie had done it. Banks admitted that, at the beginning of Officer Tofte's interview, he stated that Doe was making the story up to get her mother's attention, because she

---

[11] Banks testified, "And then she said, Papa, I'm hurting. And I said—I told her not to let nobody hurt her down there, including me."

19

was tired of being dropped off by her mother, and that Doe was mad at her mother so she took it out on him.

Banks also testified that he had never spoken to anyone who raped an eight-year-old, so he would not know if a man would remember doing it. Banks admitted that he had no evidence to call Doe a liar, nor did he have evidence to prove that anybody told her to make up her story. Banks testified that he did not like anal sex and that he was passed out that night.[12]

### 3. *State's Rebuttal Witness*

Tracy Anderson, Doe's CPS investigator, testified that she interviewed Doe in June 2005 and that the full interview, Exhibit 15, was videotaped.[13] A review of Exhibit 15 reveals that the evidence shown on this tape is the same evidence with regard to Banks's actions on June 5, 2005 as was shown on Exhibit 12, Doe's videotaped deposition.

### 4. *Analysis*

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979);

---

[12] Banks's attorney asked him, "Did you know you were having anal sex with her?" Banks's reply was inaudible.

[13] State's Exhibit 15 was admitted over Banks's objection and was published to the jury.

*Margraves v. State*, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). The jury had the opportunity to observe Banks during his testimony and draw their own conclusions about his credibility, and the credibility of all of the other witnesses. The jury had the opportunity and responsibility to weigh that evidence and determine whether, beyond a reasonable doubt, Banks committed the offenses of aggravated sexual assault and injury to a child.[14]

In light of the substance of Doe's testimony, which the jury heard from several other witnesses, and the CPS interview videotape, which essentially provided the same testimony by Doe herself, the error Banks complains of could not have prejudiced the jurors' decision-making, or their ability to properly apply law to facts in order to reach a verdict. *See Harris*, 790 S.W.2d at 587–88. After carefully reviewing the record and performing the required harm analysis under rule 44.2(a), we hold beyond a reasonable doubt that the trial court's error did not contribute to Banks's conviction or punishment. *See* TEX. R. APP. P. 44.2(a). And because of our determination that any error regarding the admission of the videotape was harmless, it is unnecessary to reach Banks's

---

[14] *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B)(i) & (2)(B) (Vernon 2007) (stating that a person commits an offense if that person, intentionally or knowingly causes the penetration of the anus of a child by any means when the victim is younger than fourteen years old); *Id.* § 22.04(a) & (h) (describing the injury to a child offense and stating that the offense may be subjected to prosecution under both this section and another section of the penal code).

argument that Doe's "unavailability" should have been reassessed at the time of trial. We overrule Banks's first issue. *See* TEX. R. APP. P. 47.1.

## V. Constitutional Challenge

In his second issue, Banks makes an "as applied" challenge to the constitutionality of article 38.071 of the Texas Code of Criminal Procedure. However, an "as applied" constitutional challenge must be raised at the trial court level. *Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995); *see also* TEX. R. APP. P. 33.1(a)(1); *Mosley*, 983 S.W.2d at 265.

Banks failed to raise this challenge to the trial court. Therefore, Banks has failed to preserve any error for our review. Banks's second issue is overruled.

## VI. Conclusion

Having overruled Banks's two issues, we affirm the judgment of the trial court.

BOB MCCOY
JUSTICE

PANEL A:   CAYCE, C.J.; DAUPHINOT and MCCOY, JJ.

CAYCE, C.J. concurs without opinion.

DO NOT PUBLISH
TEX. R. APP. P. 47.2(b)

DELIVERED: July 3, 2008